IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| United States of America, | : | Case No. 1:18-cr-26 |
| Plaintiff, | : | Judge Susan J. Dlott |
| v. | : | Order Denying Motion to Suppress |
| Seandelle McCrary, | : | |
| Defendant. | : | |

This matter is before the Court on Defendant Seandelle McCrary's Motion to Suppress evidence seized from the search of his residence, 2525 Victory Parkway #522, Cincinnati, Ohio, 45206, and a confidential informant's identification of him. (Doc. 28.) The Government filed a response in opposition to the Motion (Doc. 33), and the Court held oral argument and an evidentiary hearing on June 26, 2018. For the reasons that follow, Defendant's Motion will be **DENIED**.

I. BACKGROUND

Defendant is no stranger to this Court. In 2016, in a separate criminal action pending before the Undersigned, McCrary was indicted in the Southern District of Ohio on charges of distributing a controlled substance and being a felon in possession of a firearm and ammunition. *United States v. McCrary*, No. 1:16-cv-91 (S.D. Ohio). McCrary entered into a Plea Agreement with the Government, but at his sentencing hearing on October 20, 2017, the Court made an exception to its standard practice and held sentencing in abeyance to allow him to complete an educational program. (*See* 1:16-cv-91, Doc. 48.)

Only two months later, on December 21, 2017, McCrary allegedly sold a controlled substance to a confidential informant ("CI"), the details of which are outlined below. That same

day, the CI identified McCrary based upon a single photo presented to him by an officer. Two months later, on February 14, 2018, agents executed a search warrant at McCrary's apartment and seized the following items purportedly used in commission of the December drug trafficking: a pair of black jeans with zippers, a Louis Vuitton hat, a bullet proof vest, a plastic bag, and a black sweatshirt with a gold design. (Doc. 28-2 at PageID 86–87.)

On February 21, 2018, McCrary was indicted again in the Southern District of Ohio on new charges of distributing a controlled substance and distributing a controlled substance within 1,000 feet of a school. (Doc. 1.) He faces penalty enhancements because he was on court-ordered release from custody pending resolution of his prior case, No. 1:16-cr-91. On April 30, 2018, the Defendant filed the Motion to Suppress which is now before the Court. (Doc. 28.)

On June 26, 2018, the Court held an evidentiary hearing on the Motion to Suppress on the issue of the CI's pretrial identification of the Defendant.[1] At the hearing, the Government called Cincinnati Police Department Investigator Officer Carl Beebe and admitted the following four Exhibits into evidence: (1) the CI's buy activity log as outlined by Beebe; (2) a photograph of the Defendant; (3) a video taken by the CI of his activity during the controlled buy; and (4) a city camera video of the time frame of the controlled buy.[2]

---

[1] The parties agreed that the evidentiary hearing was limited to testimony regarding the CI's pretrial identification of the Defendant and that the issue of whether the warrant was supported by probable cause was properly decided based on the four corners of the supporting Affidavit.

[2] Exhibits 3 and 4 were blurred to protect the identity of the CI. Following the hearing, the Government supplied the unmodified versions of those videos to the Court for in-camera review.

## II. STANDARD OF LAW

### A. Probable Cause to Support a Warrant

In determining whether a search warrant is supported by probable cause, a court may consider only the "four-corners of the affidavit." *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005) (citing *Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 565 n.8 (1971)). Thus, "information known to the officer but not conveyed to the magistrate is irrelevant." *United States v. Abernathy*, 843 F.3d 243, 249 (6th Cir. 2016) (quoting *United States v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010) (citation omitted)).

An affidavit must show a "likelihood of two things" to establish probable cause for a search. *Id.* (internal quotations and citations omitted). They are: "first, that the items sought are seizable by virtue of being connected with criminal activity; and second, that the items will be found in the place to be searched." *Id*. "[E]vidence of a crime" is a critical component of a search warrant. *Armstrong v. City of Melvindale*, 432 F.3d 695, 700 (6th Cir. 2006). To this end, an applicant for a search warrant must recite the statutory violation for which the warrant is requested on the face of the warrant or in the affidavit in support. *See United States v. Abboud*, 438 F.3d 554, 569–71 (6th Cir. 2006). "An affidavit sufficiently supports a warrant so long as it provides probable cause to believe evidence of any crime will be found in the location to be searched, even if it does not provide probable cause to believe that evidence of the particular crimes listed in the affidavit will be found in the location to be searched." *Peffer v. Stephens*, 880 F.3d 256, 264 n.3 (6th Cir. Jan. 17, 2018), *rehearing en banc denied* (Feb. 22, 2018), *cert. petition docketed*, (U.S. May 23, 2018) (No. 17-1598).

Probable cause exists when "common-sense" suggests a "fair probability" that contraband or evidence of a crime "will be found in a particular place." *Illinois v. Gates*, 462

U.S. 213, 238 (1983). "[T]he affidavit supporting the search warrant must demonstrate a nexus between the evidence sought and the place to be searched." *United States v. Brown*, 828 F.3d 375, 382 (6th Cir. 2016) (citing *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc)). "The connection between the residence and the evidence of criminal activity must be specific and concrete, not 'vague' or 'generalized.'" *Id.* (quoting *Carpenter*, 360 F.3d at 595).

Probable cause "is not a high bar." *Kaley v. United States*, 134 S. Ct. 1090, 1103 (2014). "It requires only the kind of fair probability on which reasonable and prudent [people,] not legal technicians, act." *Id.* (citing *Fla. v. Harris*, 133 S. Ct. 1050, 1055 (2013) (quoting *Gates*, 462 U.S. at 231, 238)) (internal quotations omitted) (alteration in original). A reviewing court should give "great deference" to a magistrate judge's probable cause determination and reverse only if it was "arbitrarily" made. *United States v. Frechette*, 583 F.3d 374, 379 (6th Cir. 2009). And it should not engage in "line-by-line scrutiny of the warrant application's affidavit." *United States v. Williams*, 544 F.3d 683, 686 (6th Cir. 2008). The affidavit should be judged "on the adequacy of what it does contain, not on what it lacks, or what a critic might say should have been added." *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000).

*Gates* established its "totality-of-the-circumstances" analysis against the backdrop of a supporting affidavit based on a confidential informant's tip. "Informants' tips, like all other clues and evidence coming to a policeman on the scene, may vary greatly in their value and reliability." 462 U.S. at 232 (quoting *Adams v. Williams*, 407 U.S. 143, 147 (1972)). An informant's reliability, veracity, or basis of knowledge are relevant considerations, but should not be applied rigidly. *Id.* at 232–33; *see also United States v. Thomas*, 605 F.3d 300, 307 (6th Cir. 2010) ("When an affidavit relies on hearsay information from a confidential informant, the judicial officer (and reviewing court) must consider the veracity, reliability, and basis of

knowledge for that information as part of the totality-of-the-circumstances review."); *see also United States v. King*, 227 F.3d 732, 740 (6th Cir. 2000) (Veracity, reliability, and basis of knowledge of the tip "are relative where the strength of one factor may compensate for the deficiency of another." (citing *Gates*, 462 U.S. at 230, 238–39)).

### B.  Good-Faith Exception to Exclusionary Rule

"When evidence is obtained in violation of the Fourth Amendment, the judicially developed exclusionary rule usually precludes its use in a criminal proceeding against the victim of the illegal search and seizure." *Ill. v. Krull*, 480 U.S. 340, 347 (1987). But a court typically should *not* suppress "evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant." *United States v. Leon*, 468 U.S. 897, 922 (1984). The four specific situations in which an officer's reliance cannot be considered "objectively reasonable" are: (1) when the warrant is issued on the basis of an affidavit that an affiant knows—or is reckless in not knowing—contains false information; (2) when the issuing magistrate abandons his or her neutral and detached role and serves as a rubber stamp for police activities; (3) when the affidavit is so lacking in indicia of probable cause that a belief in its existence is objectively unreasonable; and (4) when the warrant is so facially deficient that it cannot reasonably be presumed to be valid. *United States v. Laughton*, 409 F.3d 744, 748 (6th Cir. 2005) (citing *Leon*).

### C.  Photo Identification

Introducing a pretrial identification that is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification" violates a defendant's due process rights. *Mills v. Cason*, 572 F.3d 246, 251 (6th Cir. 2009) (citing *Thigpen v. Cory*, 804 F.2d 893, 895 (6th Cir. 1986)). "To determine whether an allegedly suggestive pre-trial identification casts an impermissible taint on a later in-court identification, the Court utilizes a two-step evaluation."

*Id*. (citing *Ledbetter v. Edwards*, 35 F.3d 1062, 1070–71 (6th Cir. 1994)). First, a court must determine whether the procedure was unduly suggestive. *Id.* (citing *Ledbetter*.) Identifications based on single-photograph displays, like the one challenged here, generally merit moving to the second step of the analysis. *Erkins v. Chuvalas*, 684 F. App'x 493, 497 (6th Cir. 2017) (citing *Manson v. Brathwaite*, 42 U.S. 98, 116 (1977)). Step two of the analysis requires consideration of the five factors set forth in *Neil v. Biggers* to evaluate "the totality of the circumstances to determine whether the identification was nevertheless reliable." *Mills,* 573 F.3d at 251 (citing *Ledbetter* and *Biggers*, 409 U.S. 188, 199 (1972)). The *Biggers* factors are: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Id*. (citing *Biggers*.)

### III. ANALYSIS

Defendant moves to suppress the items seized at the search of his residence as well as the CI's pretrial identification of him based upon a single photograph. The Court will analyze these distinct legal issues separately. As to the former issue, the Court will conclude that the application for the search warrant of Defendant's residence was supported by probable cause, and even if it was not, the good faith exception would save the warrant. As to the latter, the Court will conclude that the pretrial identification of the Defendant is reliable.

#### A. Search Warrant

Defendant argues that the warrant authorizing search of his residence lacks probable cause, because the Affidavit supporting the application for the search warrant does not provide a nexus between the place to be searched, 2525 Victory Parkway #522, Cincinnati, Ohio 45206

("Victory Parkway"), and the alleged offense, violations of 21 U.S.C. § 841(a)(1) (drug trafficking).[3]

**1. Affidavit**

On February 13, 2018, Special Agent Edward P. Schaub attested to facts in an Affidavit in support of the application for a search warrant for Victory Parkway. (*see* Doc. 28-1.) In the application for a search warrant submitted to and signed by Magistrate Judge Stephanie K. Bowman that same day, the proffered basis for the search was "evidence of a crime" and "contraband, fruits of a crime, or other items illegally possessed." (*Id*. at PageID 73.)

In his Affidavit, Schaub avers that he has been a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") since 2014 and is currently assigned to the ATF Organized Crime Investigative Squad. (*Id.* at PageID 74.) He is the case agent for a criminal investigation involving the Defendant. (*Id*. at PageID 75.) Schaub made the Affidavit based upon conversations and coordinated efforts with other law enforcement agents, as well as his examination of reports and records. (*Id*.) The information in his Affidavit is related to a joint ATF and Cincinnati Police Department ("CPD") investigation of McCrary and is based on Schaub's training, experience, and participation in the investigation, as well as information obtained from other law agents about the matter. (*Id*. at PageID 76.)

Between November 3, 2017 and January 8, 2018, CPD District 1 received drug complaints in the area of 134 East Clifton Avenue, Cincinnati, Ohio. (*Id*.) On December 4,

---

[3] 21 U.S.C. § 841(a)(1) states:
    **(a) Unlawful acts**
    Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally--
    **(1)** to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance[.]

2017, CPD District 1 Violent Crime Squad ("VCS") received a complaint in the area of 130 East Clifton Avenue. (*Id*.) VCS officers conducted surveillance on subjects in the area and observed what appeared to be hand-to-hand drug transactions near that address by two individuals. (*Id.*) VCS approached the individuals and identified one of them as McCrary, who was found to be in possession of marijuana gummy bears. (*Id*.) McCrary was issued a ticket for knowingly possessing less than 100 grams of marijuana, and evidence collected from him was sent to the Hamilton Crime Lab for testing, which confirmed the gummy bears contained tetrahydrocannabinol, a Schedule I drug. (*Id*.)

On December 21, 2017, VCS met with a CPD confidential informant ("CI") for the purpose of purchasing drugs from subjects in the area of 130 East Clifton Avenue. (*Id*. at PageID 77.) The CI was searched for contraband and money prior to the sale with negative results. (*Id*.) Investigators provided the CI with an amount of pre-recorded U.S. currency and audio/video equipment to capture the content of the drug transaction. (*Id*.) The CI was directed to walk the area of 130 East Clifton where he/she would attempt to purchase an amount of drugs from any subject located in the area. (*Id*.)

The CI was near East Clifton Avenue and Frintz Street, when he/she located two subjects, one of which asked the CI if he/she needed a gram. (*Id*.) The CI told the subject he/she needed twenty dollars' worth. (*Id*.) The CI and subject walked back to 130 East Clifton and into a common breezeway. (*Id*.) The CI provided the subject with the pre-recorded U.S. currency, and the subject provided the CI with alleged crack cocaine. (*Id*.) The CI walked back to a predetermined location and met with CPD investigators. (*Id*.) The CI provided CPD investigators with the alleged crack cocaine and equipment. (*Id*.) The CI was then searched for any money or other contraband with negative results. (*Id*.)

That same day, VCS investigators reviewed the content captured from the audio/video equipment the CI utilized during the controlled purchase. (*Id.*) Investigators were able to identify a black male, wearing a brown hat with checkered designs, a black sweatshirt with gold designs on the lower half of the sweatshirt and sleeves, red Beats by Dre headphones, and black pants with zippers around the pocket and knee as McCrary, the subject from whom the CI purchased the amount of alleged crack cocaine. (*Id.* at PageID 78.) The CI confirmed that he purchased the crack cocaine from the individual wearing the black sweatshirt with gold designs. (*Id.*)

A portion of the incident was captured by a City of Cincinnati camera that was stationed on a building on East Clifton St. (*Id.*) Several close-up images of the individual's face who sold the alleged crack cocaine to the CI were captured, and CPD officers identified the individual as McCrary. (*Id.*) On December 29, 2017, a forensic scientist from the Hamilton County Crime Laboratory analyzed the suspected crack cocaine purchased from McCrary on December 21, 2017; test results confirmed the property was cocaine, a Schedule II drug. (*Id.*) Schaub avers that based on these facts and circumstances, and on his experience and training, he believes that on December 21, 2017, McCrary distributed a controlled substance in the Southern District of Ohio in violation of 21 U.S.C. § 841(a)(1). (*Id.*)

On February 2, 2018, Schaub was contacted by Ohio State Parole Officer Amanda Sounders regarding McCrary. (*Id.*) Officer Sounders attempted a parole visit at McCrary's parole address located at Victory Parkway. (*Id.* at PageID 78–79.) Officer Sounders knocked on the door for ten minutes with no response, although neighbors came out of their residence to complain about the knocking. (*Id.* at PageID 79.) Officer Sounders contacted federal probation who confirmed the address. (*Id.*) Federal probation indicated that McCrary was at the location

during the time Officer Sounders was knocking on the door. (*Id*.) Officer Sounders returned to the apartment and knocked again, but no one answered. (*Id*.) Federal probation advised her that based on electronic monitoring, McCrary left the apartment. (*Id*.) Based on this information, Officer Sounders concluded that McCrary lives at the Victory Parkway address. (*Id*. at PageID 80.)

Schaub avers that he knows from experience and training that individuals keep articles of clothing, such as sweatshirts, pants, and hats, along with other possessions, like electronic devices, at their place of residence. (*Id*.) He also avers that based on experience and training, dealing in illegal drugs is a cash business, so persons who traffic in narcotics routinely generate a large amount of currency they keep outside the normal banking system. (*Id*.) Consequently, many drug dealers use their homes or primary places of business to store valuables generated from drug sales, along with documents showing how much they have made and how they get, transfer, hide, or spend such money made from illegal drugs. (*Id*.) Based on these facts, Schaub believes that his Affidavit supports probable cause to search Victory Parkway.

### 2. Probable Cause Supports the Warrant

Defendant argues that all of the items seized from the search of his residence must be suppressed because there is no connection between the items the agents were searching for, clothing and evidence of drug trafficking from December 2017, and his residence two months later in February 2018. Such items, he argues, would be stale.

An Affidavit supporting a search warrant may not employ stale information, which turns on the consideration of several factors, including:

> the character of the crime (chance encounter in the night or regenerating conspiracy?), the criminal (nomadic or entrenched?), the thing to be seized (perishable and easily transferable or of enduring utility to its holder?), [and] the

10

> place to be searched (mere criminal forum of convenience or secure operational base?).

*United States v. Brooks*, 594 F.3d 488, 493 (6th Cir. 2010) (citing (*United States v. Hammond*, 351 F.3d 765, 771–72 (6th Cir. 2003)). Defendant argues the four *Brooks* factors weigh in favor of staleness. In light of the character of the crime, a single sale of $20 worth of cocaine, the best chance for recovery of evidence is immediately after the incident, not two months later. He argues that because this is a drug crime case, the information goes stale quickly, "because drugs are usually sold and consumed in a prompt fashion." *Id.* (citing *United States v. Frechette*, 583 F.3d 374, 378 (6th Cir. 2009)). In addition, the person alleged to have committed the crime, Defendant, was awaiting sentencing and other evidence indicates that his address as of December 4, 2017 was not the Victory Parkway address. The Affidavit also lacks evidence about Defendant's address on the day of the December 21, 2017 controlled buy. (*See* Doc. 28-5 (ticket for marijuana gummy bear listing different address).) The things to be seized and place to be searched also weigh in favor of staleness, as the search occurred two months after the controlled buy and there is no connection with Defendant's residence to the commission of the crime.

The Court finds that the four *Brooks* factors weigh against staleness. The character of the crime, drug trafficking, is a faster-paced crime; however, as discussed below, the evidence sought (clothing and headphones) are not items that would be unlikely to be found at an individual's residence only two months after commission of a crime. The Defendant is not nomadic, but had established a residence as set forth by evidence from his parole officer. Similarly, the thing to be seized, clothing and headphones, are not perishable or as transferrable as drugs themselves. They tend to be found at an individual's residence, as set forth in *Peffer,*

11

880 F.3d 256. Lastly, the place to be searched, Defendant's residence, was likely to house the items to be searched, as opposed to a busy street corner or location with frequent traffic.

The Government argues that this case is controlled by *Peffer*, and the Court agrees. In that case, the Sixth Circuit considered whether a search warrant failed to set forth facts establishing a nexus between the defendant's residence and any computer that could be located there, where a computer was used in the commission of the alleged crime (witness intimidation and impersonating a police officer). *Id*. at 264, 269–70. The Court relied upon the general rule that a person keeps possession where he resides, a presumption that is rebuttable. *Id*. at 270. "If an affidavit presents probable cause to believe that a crime has been committed by means of an object, however, a magistrate may presume that there is a nexus between that object and the suspect's current residence, unless the affidavit contains facts that may rebut that presumption." *Id*. Drawing an analogy to guns, the Court acknowledged that individuals who own guns keep them in their homes; thus, a suspect's use of a gun in the commission of a crime is sufficient to find a nexus between the gun used and the suspect's residence. *Id*. The Court extended this logic to computers, finding that they, too, are personal possessions likely to be stored at an individual's residence. *Id*. at 272. Because the affidavit in *Peffer* included allegations that the defendant had used a computer in the commission of his crime, that evidence of the crime would likely be found on that computer, and that the defendant resided at the relevant address, a presumption was established that evidence of the crime would be found at the place to be searched. *Id*. at 273.

The Court finds that *Peffer* is controlling. Defendant wore his clothing in the commission of the drug transaction, and the clothing is necessary to establish his identity, a key issue in the case. At the hearing, the Defendant argued that the Government's application of

*Peffer* is too broad and its application here would be akin to a general warrant, because his clothing was not the means by which the offense was committed, as in the case of the computer in *Peffer*. The Court disagrees. Unlike a general warrant, which may search for "all clothing," the Affidavit here uses precise language to describe the distinctive clothing and headphones worn by the Defendant at the time of the commission of the December 21, 2017 drug sale. Schaub's Affidavit sets forth facts establishing the CI purchased drugs on December 21, 2017, the dealer wore a black and gold sweatshirt, brown hat, red headphones, and black pants with zippers, the police identified Defendant as the individual wearing those items, the police identified Defendant as the individual who sold the drugs, and through probation, the agents determined Defendant lived at the Victory Parkway address. Schaub avers that based on his training and experience, individuals generally keep their clothing and accessories where they reside. Based on these facts, the magistrate judge reasonably determined that, like guns and computers, clothes, a hat, and headphones are objects that generally remain in a person's possession after commission of a crime, and it is reasonable to believe that they would be stored at the suspect's residence. *Peffer* establishes the presumption that, unless rebutted, the Defendant's clothing and headphones would be at his residence. That presumption has not been rebutted here.

Finding *Peffer* controlling, there is no Fourth Amendment violation. The search warrant was supported by probable cause.

### 3. Good Faith Exception to Exclusionary Rule Would Apply

Had the Court concluded otherwise and, under the totality of the circumstances, found probable cause to be lacking, the *Leon* good-faith exception to the exclusionary rule nevertheless would apply. Defendant argues that the Affidavit is so lacking in indicia of probable cause that a

belief in its existence is objectively unreasonable, and reliance upon it was neither in good faith nor objectively reasonable. When the "stale" information is excised from the Affidavit supporting the warrant, no reasonable person would believe probable cause exists, argues Defendant. Furthermore, the particularized evidence establishing a nexus between the items to be seized and place to be searched is so lacking that no reasonable law enforcement officer would have placed objective good faith reliance upon the warrant.

The Court disagrees. The Affidavit supporting the warrant is not "bare bones," that is, one that states only "suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge." *United States v. White,* 874 F.3d 490, 496 (6th Cir. 2017) (quoting *United States v. Laughton*, 409 F.3d 744, 749 (6th Cir. 2005)). As has been detailed *supra*, the Affidavit sets forth the details of the December 21, 2017 drug transaction as corroborated by video surveillance and the CI's identification of the Defendant, as well as a description of the clothing the Defendant was wearing at the time of the drug deal. When the reviewing court can identify "**some** connection, regardless of how remote it may have been"—"some modicum of evidence, however slight"—"between the criminal activity at issue and the place to be searched," then the affidavit is not bare bones and reliance on it is reasonable. *Id.* at 497 (citing *Laughton*) (emphasis in original). Further, a bare bones affidavit should not be confused with one that lacks probable cause, and the distinction is not one of semantics. *Id.* "There must be daylight between the 'bare-bones' and 'substantial basis' standards if *Leon*'s good-faith exception is to strike the desired balance between safeguarding Fourth Amendment rights and facilitating the criminal justice system's truth-seeking function." *Id.* Furthermore, it is reasonable for the Magistrate Judge to rely upon binding precedent – in this case, the *Peffer* case. *Davis v. United States*, 564 U.S. 229, 241 (2011) ("Evidence obtained

during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule.")

In sum, the Court concludes that the Magistrate Judge's reliance upon the Affidavit was reasonable, and, in the alternative, *Leon*'s good-faith exception applies and saves the search.

### B. Pretrial Photo Identification of Defendant

Defendant also moves to suppress the CI's identification of him based upon a single photograph shown to him by Officer Beebe.[4] Because a single-photograph identification generally is suggestive, the Court will consider the totality of the circumstances and whether the identification by the CI of Defendant is reliable. It must consider (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Mills,* 572 F.3d at 251 (citing *Biggers*.) At the hearing, the Government called Officer Beebe to testify. The Court will highlight the most important testimony and its bearing on these five factors, which support the conclusion that the identification is reliable and should not be suppressed.

Officer Beebe credibly testified that after the VCS received several complaints of drug activity in the area of 130 East Clifton in Cincinnati, they arranged for a CI to attempt to make a drug purchase in the area through a controlled buy. (Doc. 37 at PageID 145–46.) He had used the CI over the course of a year-and-a-half for approximately three to four dozen other controlled

---

[4] According to a Report of Investigation ("Report"), the CI identified the Defendant based upon a single photograph he/she was shown by Officer Beebe. (Doc. 28-3 at PageID 92–93.)

drug buys and intelligence-gathering efforts. (*Id*. at 146–48.) The CI also has a long history of approximately thirteen to fifteen years with the police department as a CI. (*Id*. at 147.)

On December 21, 2017, prior to the controlled buy, Officer Beebe searched the CI for contraband and money, equipped the CI with audio and video recording device, and provided instructions for the buy. (*Id*. at 149.) Office Beebe instructed the CI to take the twenty dollars provided by him and attempt to make a purchase of drugs from anyone within a certain geographical area, gather as much information as possible, and be able to give a clothing description so the police can attempt to observe the subject. (*Id*. at PageID 148.)

The CI set out at about 2:00 p.m. on December 21, 2017, and the police kept an open line with him to be able to hear some of what was going on. (*Id*. at 150.) Police Officer Ashley Jenkins was viewing the area remotely by a fixed camera in the area. (*Id*.) The CI left, met with a suspect standing on the street, went into a breezeway, where the suspect provided the CI with crack cocaine in exchange for twenty dollars, and then the CI left the location and returned to the agreed-upon location to turn over the crack cocaine. (*Id*. at 150, 152.) Two recording devices tracked the interaction: the equipment carried by the CI and a city camera affixed to a building at the corner of Clifton and Lang. (*Id*. at 151.) According to Officer Beebe's notes, the CI left the car at 2:02 p.m., visual contact was lost at 2:10 p.m. when the CI went into the breezeway with the subject, and the CI returned to the car at 2:15 p.m. (*Id*. at 154–55.) Thus, the entire incident took less than fifteen minutes.

After the CI returned, Officer Beebe took the CI's recording device to ensure it was still operating normally, retrieved the contraband, and then conducted another search to ensure there were no additional currency or drugs. (*Id*. at 151.) The CI then provided a description of the activities and suspect. (*Id*. at 151–52.) The CI described the individual who sold him drugs as a

16

black male, with a bit of facial hair, stocky, approximately six feet, one inches to six feet, two inches, 25 to 26 years of age who was wearing a black sweatshirt with a distinctive gold pattern on the sleeves. (*Id.* at 153, 156.) The description was provided immediately following the CI's controlled buy and recorded by Officer Beebe. (*Id.* at 153, 156)

Upon receiving the description of the subject, Officer Beebe relayed that information to the other officers in the area, including Officer Jenkins who was viewing the cameras remotely and had been watching the controlled buy via camera. (*Id.* at 157.) Officer Jenkins relayed that she had seen that subject leave the breezeway known to be connected to the building the CI entered with the suspect shortly after the CI left. (*Id.*) That subject matched the clothing and physical description provided by the CI. (*Id.*) Officer Jenkins zoomed in on that suspect's face and clothing and immediately recognized that subject as the Defendant. (*Id.*)

Officer Beebe left the CI with another officer while he viewed portions of the city camera footage, which is when he recognized the subject as the Defendant. (*Id.* at 158, 166.) He printed a photograph of the Defendant from the BMV database. (*Id.* at 158.) Approximately thirty minutes later, Officer Beebe showed the photograph of the Defendant to the CI and asked the CI if he recognized that individual. (*Id.* at 165–66.) The CI responded that the Defendant was who had sold him the drugs. (*Id.*) The CI's identification of the Defendant was nearly "instantaneous" and he did not waiver in answering, make any facial expressions, or appear uncertain. (*Id.* at 167.) Officer Beebe testified that he had no reason to believe the CI was not of sound mind at the time of the identification. (*Id.*)

Based on this testimony, the five *Biggers* factors weigh in favor of reliability. As to factor one, the opportunity of the CI to view the suspect, the CI's encounter with the Defendant lasted a few minutes, during which the CI and Defendant stood within close proximity during the

light of day. Because the CI was instructed immediately prior to the interaction, he was more apt to pay close attention to the physical and clothing description of the Defendant. Second, as to the CI's degree of attention, the CI was not a casual or passing observer, but a paid informant who was given explicit directions to follow and had operated as a paid police informant many times before. Although we do not have the testimony of the CI, Officer Beebe provided credible testimony that the CI was instructed to pay close attention to the details of the transaction and the description of the drug dealer and that individual's clothing description. As he provided those details immediately following his interaction, which only lasted a short duration, the degree of attention is presumed to be high.

Third, as to the accuracy of the description, the CI's description of the Defendant classified his height, race, build, facial hair, age, and clothing, which Officers Beebe and Jenkins were able to match with an individual who exited a breezeway known to be connected to the entrance where the CI and Defendant were, shortly after the CI completed his controlled buy from a city camera feed. The CI was able to identify the Defendant within thirty minutes of the purchase by viewing the proffered photograph. No claim has been made that the details provided by the CI were erroneous or inaccurate.

Fourth, as to the CI's level of certainty, Officer Beebe testified that the CI's level of certainty in his identification was high as he did not waiver and responded affirmatively nearly immediately following the photograph being shown to him. As elucidated on cross-examination, there are reasons to question the credibility of the CI. Primarily, the CI was paid immediately approximately $60-$80 for his services immediately following his positive identification and after he had been waiting approximately thirty minutes for Officer Beebe to return to the car. (Doc. 37 at PageID 177, 192.) In addition, at some point, the feed cut out and there was no

18

audio/visual contact with the CI during the buy, so there was no visual of the drug transaction itself. (*Id.* at 188.) The CI is instructed that if the recording device may be discovered or identify them as being associated with the police, it should be concealed. (*Id.* at 200.) However, the CI's long-standing relationship with Officer Beebe and the police department aid in bolstering his credibility. And in addition, no claim has been made that the photograph shown to the CI was not the Defendant. Thus, while not as compelling as other factors, this factor still weighs in favor of reliability.

Fifth, as to the length of time between the crime and confrontation, the time between the drug sale and the identification was short. The CI provided a description within minutes of the crime, and the photo identification occurred only thirty minutes later. There was no time lag of hours, days, or months, to hinder the CI's memory and thwart a positive identification.

Taken together, these factors weigh in favor of reliability. Most persuasive to the Court here are the opportunity of the witness to view the Defendant, particularly in light of the explicit instructions he was given by Officer Beebe and the short length of time—thirty minutes—between the crime and identification. In all, the Court finds this identification to be analogous to others in which the Court has found single-photograph identifications reliable. *See Manson*, 432 U.S. at 115–16; *United States v. Simmons*, 633 F. App'x 316, 320–21 (6th Cir. 2015); *United States v. Meyer*, 359 F.3d 820, 824–26 (6th Cir. 2004); *United States v. Brown*, No. 3:15-cr-371, 2017 WL 2305247, at *2–3 (N.D. Ohio May 26, 2017). The totality of the circumstances supports the conclusion that the CI's identification of the Defendant is reliable. The Motion to Suppress is therefore **DENIED**.

## IV. CONCLUSION

Defendant's Motion to Suppress both the evidence seized from his residence and the CI's positive identification of him is **DENIED**.

**IT IS SO ORDERED.**

S/Susan J. Dlott_____<br>
Judge Susan J. Dlott<br>
United States District Court